We'll turn to the first case, In Re. American Express. Morning, Scott Martin, Hausfeld LLP for the Appellants, Your Honor. May I please support and may I pause for a moment just to acknowledge the passing last week of your colleague, Judge Winter, whose long and distinguished service was an inspiration to so many of us and I know Mr. Chesler shares that sentiment, I just happened to be speaking first. This appeal addresses whether the district court was correct in dismissing at the pleading stage the claims of a class of merchants who alleged they paid higher merchant fees as a consequence of accepting the very payment cards that were directly targeted by Amex's so-called anti-steering rules, which were designed to restrain price competition from those competing card networks. We respectfully submit that the district court erred in doing so. As the court is aware, section 4 of the Clayton Act, 15 U.S.C. section 15 provides redress for plaintiffs who are injured in their business or property by reason of anything forbidden in the antitrust laws. Section 4 does not require a plaintiff to be in contractual privity with or to engage in any transaction with the antitrust wrongdoer. Section 4 has broad remedial and deterrent objectives. One could be, for example, as in the Supreme Court's familiar McCready decision, a psychologist patient who was not reimbursed pursuant to an insurance plan purchased by her employer because of a conspiracy between Blue Cross and a psychiatric association to exclude psychologists from competing competition. Mr. Martin, can I ask you, there was a lot of back and forth in your brief and also in the Meekie brief about umbrella plaintiffs and whether or not they should have antitrust standing. I guess I don't understand why we would be deciding that globally. And it seems like you're almost urging the court to ignore the multi-factor test in AGC and go boy them. That suggests that whether or not you're an umbrella plaintiff or not obviously goes to the directness of the injury, but there's much more to the analysis than that. It's going to be on a case-by-case basis. Maybe some umbrella plaintiff may have a standing and satisfy the efficient enforcer test and some may not. Why would we be deciding that sort of more globally? Judge Bianco, I don't disagree with you. I think it happens to be the elephant in the room and as a consequence, it features in the briefing. I agree with you here. Plaintiffs clearly alleged and Amex and the district court acknowledged that they did so allege that the anti-steering rules caused super competitive prices to be charged to merchants by all credit card networks. That includes merchants like the plaintiffs here, the appellants who accept Visa, MasterCard and or Discover, but not American Express. That should hardly be surprising. You would concede it's an obviously indirect injury, right? You would concede it's not a direct injury. Your Honor, I would not concede that at all. I think the anti-competitive conduct here was a direct cause of their injury. Certainly, it was foreseeable to Amex as merely a natural extension of the intended consequences as to the Amex accepting merchants. I think that's clear. For example, Judge Easterbrook- Can you explain why your position is that there is a direct injury when the plaintiffs or your plaintiffs do not accept American Express cards? There's no relationship with American Express. They're not bound by the anti-steering rules. They don't compete with American Express. How is there a direct injury? First of all, the point of the anti-steering rules, of course, was to stifle price competition by those three networks that are accepted by our plaintiffs. As a consequence of the steering rules, there really can be no doubt that prices are elevated across the market for a number of reasons. First of all, those plaintiffs, our plaintiffs, the appellants- How are the injuries direct? Our case law says that directness means close in the chain of causation. How does this fit within- It's clearly foreseeable, Judge Chen, and beyond that, the prices, the merchant fees that are charged to all merchants are going to elevate under the umbrella. American Express, there can be no doubt, American Express knows that. It's in the very market- Isn't your argument that when a seller creates a cartel or does something anti-competitive to raise prices for its own good, that that is just going to raise prices for the good in the marketplace? That seems like that's a direct consequence. Isn't that your argument? It's pretty straightforward. That is our argument, Judge Menasche, except I think it's even worse here. If you're in a cartel situation, there is at least an incentive for the fringe sellers, the non-cartelists, to price at some marginal level below the cartel price. I guess I have that question about this whole debate over umbrella standing, which is, it seems like the Efficient Enforcer Test is directed at avoiding cases in which there's going to be problems of proof and causation. In the normal umbrella standing case, you're going to have a cartel that raises prices, and then the umbrella purchasers are going to face higher prices, but they're not buying from the cartel, and so they're probably not facing prices as high as the cartel price. Then there's going to be debates over whether the cartel was big enough to affect the prices that they face, or whether maybe the cartel was geographically concentrated and didn't affect them, or maybe there's some discretion on the part of the sellers from whom they're purchasing, and it's going to be hard to disentangle all of those questions. So isn't that the reason why, even though there is an injury to the umbrella purchasers, courts generally say, no, we are going to stop at the first step of the chain and just not entertain suits from the umbrella purchasers, from people who don't buy from the cartel? Well, I would say first, and again, we're on the umbrella standing question. The Third, Fifth, and Seventh Circuits have all accepted the premise of umbrella standing, but to your point, in this particular circumstance, we are on the same level. We are dealing with merchants. They just happen to be merchants who are paying higher merchant fees to the other payment charges. Your case is interesting because actually, in this market, there only are four sellers, so a lot of figuring out how much the cartel price affected the non-cartel price, maybe you don't have that. So I guess my question is this, so if I'm concerned about all the consequences of recognizing umbrella standing, if we were to find for you in this case, would it lead to the consequence that we're just recognizing umbrella standing in general, or is there an argument that your clients have antitrust standing here, but we don't generally recognize standing of umbrella plaintiffs? So let me answer both parts of the question, Judge Menagie. I think with respect to our clients, they are particularly well-situated, and I'll turn to that in particular in a moment, but in general, I think the guiding principle needs to be Section 4 of the Clayton Act, which is to say, is there a cognizable antitrust injury, and is there proximate cause as a consequence of the conduct? And I think that's what's... We put limitations on it that go beyond injury and proximate cause, right? So the whole inquiry the Supreme Court is getting at is, we don't think that there should be treble damages for an injury all the way down the line. And you see this kind of principle throughout the law, right? So in tort, there's the economic loss rule, that if I damage right away, I'm liable to the owner of it, but everybody who used it to get to their work can't sue me for all of their lost wages for the delay, right? So it's not that they don't have an injury, and it's not even that it wasn't foreseeable that that's a consequence of the harm. It's that, you know, when we're calculating damages, we determine something like the efficient enforcer rule. We decide who's best positioned to recover for it, and it's going to be crushing liability and hard to administer if there's liability all the way down the line. So even if it's foreseeable, and even if there's injury, don't we still need to be concerned about how we're going to administer a kind of rule that allows for liability or for plaintiffs to sue all the way down the line? We do, Your Honor, and I'm not focused on Illinois brick questions here. And I recognize the point of being involved in several financial benchmark cases within the Second Circuit. I think the points that we make here in our briefing, number one, are with respect to the Galboim factors, the four key factors from American Associated General Contractors, the District Court aired, and number two, for our particular set of plaintiffs who do not accept American Express, they are not bound by American Express's merchant agreement. And as a consequence, unlike those, they're actually, they need not be the most direct or the most efficient enforcers. But in this situation, Your Honor, I would argue that they would, because in fact, they are the ones who can sue by way of class action in federal court. All right. You have two minutes for rebuttal. We'll hear from you. Sir, can I ask one last question, sir, just on the last point you made. So are you saying that they are efficient enforcers because the better plaintiffs are subject to an arbitration agreement and so can't do a class action? Is that the reason why? No, Your Honor. I'm saying they're efficient enforcers regardless. I'm saying though, in this particular circumstance, I believe they are the most efficient enforcers because they are the ones who can seek the market-wide relief on behalf of the entirety of the class. Okay. Thanks. All right. Thank you. Mr. Chesler? Good morning, Your Honors. Evan Chesler for the appellees. First, I think our position is clear, but I just want to state it. These merchants have absolutely no connection to or relationship with American Express. It's not just that they're not subject to our contract and they're not bound by the non-discrimination provisions. There is no relationship. They're not competitors. They're not customers. They do no business with us. They're absolutely remote from American Express. There are multiple links between the NDPs that are accused here and these merchants. In fact, the attenuated relationship between them and our NDPs was explicitly addressed by the Supreme Court in the Ohio against American Express case. The Supreme Court said, and I'm quoting, Visa and MasterCard's merchant fees have continued to increase even at merchant locations where American Express is not accepted and thus American Express anti-steering provisions do not apply. The Supreme Court made exactly the same point, that there's no linkage between these NDPs, these non-discrimination provisions, and these plaintiffs. That means that the merchant fees are not increasing by reason of the direct application of American Express's anti-steering fees. But if in fact American Express is increasing merchant fees for merchants with whom it deals, and that is a large enough part of the market, wouldn't you just expect merchant fees to increase throughout the market for credit card acceptance? Not at all, Your Honor. The evidence in the U.S. case, for example, demonstrated, and there's no reason to think otherwise here, that it's the competition among the cards that are accepted by the merchant that drives the competition. And that ignores something that these plaintiffs ignore, and I'll come to in a moment, which is the other side of this two-sided platform, the consumer side of the platform. And I want to come back to that in a moment. But in fact, there's no reason to assume that the price competition that takes place at a merchant that accepts all four cards is in fact the same price competition that takes place at a merchant that accepts two or three of those four cards and not another. There's no basis for that. It's in fact... But he's a MasterCard and Discover to charge certain merchant fees to those merchants who take American Express, because there's some different rules there, and then charge a different set of fees to merchants that don't take American Express because there aren't the same rules. They not only can, they do. That's in fact the way the market works. Is that in the record? So are you disputing the idea that these plaintiffs even face higher merchant fees? It's in the record in the U.S. case, Your Honor, and in the findings that were then rejected by this court in U.S. against American Express on market definitional grounds, my point. There's nothing... Based upon the determination that the district court must make at the pleading stage, there is no basis, in fact, to infer that there is any price effect at the other merchants. And in any event, it is so attenuated that it fails the directness... I get your point about how conduct on the merchant side might be offset by conduct on the cardholder side, like it's a two-sided platform. I understand that. But you don't dispute the basic economic principle that if somebody engages in or forms a outside the cartel or even outside from other sellers who sell the same good within the market. But that doesn't... Do you dispute that? I don't dispute that that can be the case in certain markets. I do question whether that is an inexorable rule that is true in every market. I haven't been involved in other cases where that's not been true. So it's certainly... Don't they allege that here, Mr. Chesler? Isn't that part of their allegations? This is a motion to dismiss. They're alleging that that's what's happening here. Yeah, they're alleging that that's what's happening here. And our position is that that is sufficiently attenuated that it fails to direct the standard under AGC. It fails the fact that there are better plaintiffs to enforce the case. Indeed, the merchants who accept our cards... Let me ask you about that, Mr. Chesler, because their argument, as you heard a moment ago, is that because of the arbitration provision, that that's not efficient, that you essentially have to go merchant by merchant. That's not efficient. What's your response to that? I've got two responses. One is the Department of Justice explicitly sued for the benefit of the merchants who accept our cards. Their entire case was premised on the notion, which was then rejected by this court and by the Supreme Court, that those merchants were paying higher fees than they would otherwise pay and that that was an antitrust violation. The fact that they lost that case can't mean that we can now be sued by more remote plaintiffs, that we'd be in a worse position. We'd be in a better position for these plaintiffs if the outcome had come out... Is there any reason why the federal government and or state governments can bring another suit at this point? Couldn't they renew a suit or some other state government renew a suit as well? I don't believe so. I think it's the law of the case now established by this court and the Supreme Court said that that market definition was flawed. That case has been litigated. It's res judicata. I have a second answer to Your Honor's question. Not only was it the case that those merchants were explicitly the merchants on whose behalf the Department of Justice and all the attorneys general sued in the other case, but the fact that those merchants have sued on their own behalf and it goes to arbitration doesn't make them inefficient enforcers. That would undermine the holding of the Italian colors case in the Supreme Court that says that arbitration provisions are perfectly lawful and appropriate ways to enforce rights. That exact argument was made and rejected by the Supreme Court and Justice Scalia's opinion in Italian colors. There's no there's no sense in which arbitration is viewed as an unacceptable or even less acceptable form of enforcement of rights. Had it been, the Supreme Court would have come out the other way in Italian colors. So I think the plaintiff's argument on that ground is... Justice, with respect to umbrella standing, do we need to decide the question if we conclude that there is umbrella standing, that there's such a thing as umbrella standing? How does that impact the case? I don't believe you need to reach that at all. And I would urge this court not to take the bait that's been strewn across the water here by the meekie and by the plaintiffs. The district court found that whether or not umbrella standing could exist, whether or not, these plaintiffs are not efficient enforcers. And unless this court holds that umbrella standing somehow preempts the AGC standard, which it's never held. And in fact, this court, as I'm sure Your Honor knows, routinely enforces and applies the AGC standards. There's no there's no basis, I believe, on which to find that even if umbrella standing applied here, if you reach that issue, it would alter the outcome that the district court found, which is these plaintiffs fail to satisfy the AGC standards. And again, I wouldn't reach that issue because this is not a case that needs to reach it, nor is it a case that did reach it. Just what you think the AGC standard is about. So we were saying a moment ago that if there's injury and proximate cause, it should be enough. And I was suggesting that there seems to be some other principle that just that we see across the law that at some point you need to cut off liability. So what is that principle? What is the ultimate purpose of the AGC standard? It seems like even if we could say that there's injury and proximate cause, there still might be too attenuated a connection to the original wrongdoing that would require a cutoff. How do we articulate what principle we're applying when we do that kind of a thing? Well, Your Honor, I think it's a principle that we often find in the antitrust laws. It's a principle, for example, that's applied all the time in Illinois brick cases. There's no question that secondhand brick is a pass through, right? It's like you could say that there's a harm to somebody and that that person is passing the harm to somebody else. It's sort of different here where they're alleging that your client has raised prices for a good across the market and they buy that good, right? This is not a pass through case. It's not a pass through case. But I was pointing to the underlying antitrust principle, Your Honor, that there are simply circumstances where someone's injured, but the injury is just too remote to find an enforcement basis under the antitrust laws. And for example, in Gelboim, this court made a point which the district court here made as well, which is that the consequence of finding standing here effectively would make this defendant potentially liable for every transaction involving every merchant fee under every card in the country. There comes a point where you look at that and you just know intuitively as a court, I would submit, and as an experienced antitrust practitioner, that's wrong. That's not what the Clayton Act was intended to do. It's not what the antitrust laws were intended to do. It's one example of that. Is that a limit? So when we're entertaining an antitrust claim and recognizing antitrust standing in a particular case would make the defendant liable to the entire market, is that a sign we've gone too far down the chain? Is that sort of where we'd cut it off? Or at least that's a clear signal? I think it's a red flag, Your Honor. I think it should say to the court, a court should then say, is that really justified? There may be cases. There will be cases where they might control the whole market, right? So in your case, aren't there just four providers of credit card services? And so if the four of them are involved in cartel-like behavior, anti-competitive conduct, maybe it's appropriate to say that everybody in the market has a claim against them. Your Honor, my client has about 25% of the transaction volume in the United States. Visa and MasterCard have about 70%. So I think when we keep talking about cartels, this is... It's the paradigmatic umbrella case, is the cartel. But I understand the circumstances of this case. Can I ask you for a minute about the California claim? They cite district court cases, two district court cases out there, as you know, that suggest they might not apply the AGC test. What's your response to that? Yeah, Your Honor, there's no appellate decision in the Ninth Circuit that said that they don't apply it. I think the district court's reasoning here was absolutely sound, that there is a lot of case law in the Ninth Circuit that says that the Cartwright Act follows the principles of the Sherman Act and the Clayton Act. This was developed, the Supreme Court said in AGC, that their four-part test derives directly from the Clayton Act. So the principle that the Cartwright Act should be governed by and follow the same basic principles that are used when applying the Clayton Act and the Sherman Act applies here. Yes, there are a couple of district court cases that suggest otherwise, but there's no authority in the Court of Appeals in California for the Ninth Circuit that says that AGC does not apply, and AGC is the law of the land, and there's a lot of compelling authority that says Cartwright follows the Sherman Act and the Clayton Act. So I think the district court was correct in its reasoning there. I know I only have a few more seconds. I would just, we haven't reached the other elements, unless Your Honors have questions with respect to the third and fourth factors. I think they're pretty straightforward. The amount of speculation that would have to go on here to get from the merchants who accept our cards and what the but-for world would look like at those merchants, let alone what the but-for world would look like at merchants who never accepted our card, would be the kind of regression analysis that economists get rich on. It's the kind of thing that would be highly speculative and plainly fails the third factor of AGC. I think there's no question that the district court was correct in finding that these plaintiffs don't satisfy the standard. Thank you. Mr. Martin, you have two minutes for rebuttal. Thank you, Your Honor. With respect to the last points in terms of the final two AGC factors, I'd just refer to our brace and indicate economists are well aware of how to deal with umbrella damages. It's been written on. Mr. Martin, I do want you to address this issue of duplicative recovery. I don't understand. In the Visa MasterCard Discover Settlement, it was the same harm, higher merchant fees. It's the same time period, I think. You can correct me if I'm wrong. Why isn't there a potential duplicative recovery for the same harm that your client's potential already recovered on? Because, Your Honor, it doesn't address the anti-steering rules. It doesn't address Amex's conduct. It addresses conduct by... It doesn't matter what conduct... On the issue of duplicative recovery, it doesn't matter what conduct it's addressing. It matters what harm you're being compensated for. It's the same harm, the higher fee, right? And if, Your Honor, if some portion of that can be... If some portion of that is duplicative, then that's something... How would that court ever... How would that ever be figured out, which portion of the higher fee was from their own steering rules versus Amex's steering rules? I don't understand how you could possibly figure that out. Well, Your Honor, all antitrust lawyers like to think that they're amateur economists. So I won't answer that. I will say that the modeling would certainly be done in terms of a but-for world in the first instance. And the but-for world would depend on the presence or absence of the anti-steering rules here. I'd also like to stress that we need not be the only enforcer or the most efficient enforcer. Apple v. Pepper recognizes there can be more than one. What about this point that if we accept your theory, then Amex is liable to every merchant who takes credit cards in the whole marketplace. And it suggests that we've gone too far in expanding their exposure to liability. How do you respond to that? Well, there are only four participants in the market. The appellants that we represent may not be customers, but they're potential customers of Amex. In that same market, they participate on the same level and purchase directly from Amex's competitors who are directly targeted by the anti-steering rules. They happen to be affected both with respect to Amex-accepting merchants and non-Amex-accepting merchants. I would argue it's not at all a ten-pointed judge. All right. Thank you both. The court will reserve decision.